*In the Matter of the Petition of the Maryland Office of People's Counsel*, No. 11, September Term, 2023, Opinion by Booth, J.

**PUBLIC UTILITIES – ADMINISTRATIVE LAW – AGENCY DEFERENCE.** When undertaking judicial review of a decision of the Maryland Public Service Commission ("Commission") approving a public service company's application for a rate increase under Section 3-203 of the Public Utilities Article of the Maryland Code, a reviewing court is to apply an arbitrary or capricious standard of review to the Commission's interpretation of its own order that it entered in connection with its approval of the acquisition of the public service company.

The Supreme Court of Maryland held that the Commission's interpretation of its own merger order in connection with a public service company's application for a rate increase was not arbitrary or capricious.

Circuit Court for Baltimore City
Case No.: 24-C-21-003749
Argued: December 4, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 11

September Term, 2023

IN THE MATTER OF THE PETITION
OF THE MARYLAND OFFICE OF
PEOPLE'S COUNSEL

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Opinion by Booth, J.

Filed: February 23, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

> The General Assembly has provided for judicial review of [decisions of the Public Service] Commission, but that review is to be deferential to the Commission's expertise and findings. The role of the courts is to ensure that the Commission has exercised its discretion in carrying out this important responsibility within the bounds prescribed by the General Assembly and the Constitution.
>
> *Office of People's Counsel v. Md. Public Service Commission*, 461 Md. 380, 384 (2018)

In Maryland, the General Assembly has determined that an acquisition of a public service company by another public service company should be reviewed by the Maryland Public Service Commission ("Commission"), an administrative body with specialized knowledge of utility markets. The Commission must determine whether the proposed transaction is "consistent with the public interest, convenience, and necessity, including benefits and no harm to consumers."[1] The Legislature has identified certain factors for the Commission to consider and has also vested considerable discretion in the Commission to consider other matters that it may find pertinent when undertaking its assessment. One factor that the Commission is required to consider is the potential impact that the acquisition will have on rates and charges paid by Maryland customers, and the services and conditions of operation of the public service company after the merger or acquisition. After it completes its analysis, the Commission must either approve or reject the transaction, or approve it with conditions.

---

[1] Md. Code Ann., Public Utilities Article ("PU") § 6-105(g)(3)(i) (2020 Repl. Vol., 2023 Supp).

The Legislature has also granted the Commission the authority to set rates charged by a public service company to Maryland customers. In undertaking this duty, the Commission is required to utilize its expertise to establish a rate that enables a utility company to cover prudent expenses and earn a reasonable profit.

When the Commission exercises any of the above-described powers or duties, it does so within the context of an administrative proceeding. And, as we discuss in detail herein, the General Assembly has set forth specific parameters for judicial review of Commission decisions.

This case concerns the Commission's approval of an application for a base rate increase filed by Washington Gas and Light Company ("Washington Gas")[2] in August 2020 (the "rate administrative proceeding"). The rate administrative proceeding occurred approximately two and one-half years after the Commission concluded an administrative proceeding in which it approved the acquisition of Washington Gas by AltaGas Limited ("AltaGas") (the "merger administrative proceeding").[3] The Office of People's Counsel

---

[2] Washington Gas is a public service company that provides natural gas and delivery services to customers in the Maryland counties of Montgomery, Prince George's, Charles, Calvert, St. Mary's, and Frederick, as well as customers in Washington, D.C., and jurisdictions in Virginia. To transport natural gas to its customers, Washington Gas operates a system of distribution pipelines spanning its geographic service area throughout Maryland, Virginia, and Washington, D.C.

[3] AltaGas is a North American diversified energy infrastructure business with operations in Canada and the United States. Its headquarters is located in Calgary, and its business is focused on three business segments: utilities, gas, and power.

("OPC")[4] participated in the merger administrative proceeding, as well as the rate administrative proceeding.

This appeal centers on a determination that the Commission made in the rate administrative proceeding concerning the proper interpretation of a condition the Commission had included in its final order approving the merger. That condition required that Washington Gas customer rates reflect "merger-related savings" of "not less than $800,000 per year over the five years" following the merger's closing. The Commission interpreted that requirement to mean that Washington Gas's post-merger costs must be $800,000 per year less than they would have been but for the merger. Washington Gas agrees. OPC, by contrast, contends that the condition required Washington Gas's post-merger costs to be $800,000 per year less than they were the year before the merger.

OPC did not file a petition for judicial review of the Commission's final order approving the merger, but it did file a petition for judicial review of the Commission's order approving Washington Gas's request for a rate increase. After the circuit court

---

[4] The People's Counsel—a position created by the General Assembly—is an attorney licensed in Maryland who is appointed by the Attorney General with the advice and consent of the Senate. PU § 2-202. The duties of the Office of People's Counsel ("OPC") include evaluating "each matter pending before the Commission to determine if the interests of residential and noncommercial users are affected." *Id.* § 2-204(a)(1)(i). If OPC "considers the interest of residential and noncommercial users to be affected, [it] shall appear before the Commission and courts on behalf of residential and noncommercial users in each matter or proceeding over which the Commission has original jurisdiction[.]" *Id.* § 2-204(a)(2).

affirmed the Commission's rate increase decision, which was then affirmed by the Appellate Court of Maryland, OPC filed a petition for writ of *certiorari*, which we granted.

OPC raises the question of whether the Commission erred in its interpretation of the condition in its merger order that provided the method by which Washington Gas was required to compute its "merger-related savings" when applying for a rate increase. We are also asked to determine the standard of review that a court must apply when reviewing the Commission's interpretation of its own prior decision or order. For the reasons we set forth more fully herein, we hold that a court is to apply the "arbitrary or capricious" standard of review. Applying that standard here, we conclude that the Commission's interpretation of its own order was not arbitrary or capricious.

# I

## Statutory Framework

The jurisdiction and powers of the Commission extend to all public service companies operating a utility business in Maryland, to the full extent permitted by the Constitution and the laws of the United States. Md. Code Ann., Public Utilities Article ("PU") § 2-112 (2020 Repl. Vol., 2023 Supp.). Generally, the Commission has supervisory and regulatory authority over public service companies to "ensure their operation in the interest of the public[,]" and to "promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination[.]" *Id.* § 2-113(a)(1)(i). The Commission also has broad enforcement authority to ensure compliance with laws,

4

"including requirements with respect to financial condition, capitalization, franchises, plant, manner of operation, rates, and service." *Id.* § 2-113(a)(1)(ii).

### A. *The Commission's Authority Over Public Service Company Mergers*

In general, one may not acquire a public gas or electric company that operates in Maryland without prior authorization from the Commission. *Id.* § 6-105(e)(1). To obtain that authorization, the applicant must file an application with the Commission containing detailed information concerning the transaction and provide certain documentation. *Id.* § 6-105(f).

The Commission is then required to "examine and investigate each application" and to conduct any necessary administrative proceedings for review of the application. *Id.* § 6-105(g)(1). The applicant has the burden of persuading the Commission that the "acquisition is consistent with the public interest, convenience, and necessity, including benefits and no harm to consumers." *Id.* § 6-105(g)(3)(i), (5). In connection with its review, the Commission is required to consider a list of 12 statutory factors.[5] *Id.* § 6-

---

[5] Those factors are:

(i) the potential impact of the acquisition on rates and charges paid by customers and on the services and conditions of operation of the public service company;
(ii) the potential impact of the acquisition on continuing investment needs for the maintenance of utility services, plant, and related infrastructure;
(iii) the proposed capital structure that will result from the acquisition, including allocation of earnings from the public service company;
(iv) the potential effects on employment by the public service company;

105(g)(2)(i)–(xii).  The Legislature has granted the Commission considerable discretion in connection with its decision to approve an acquisition.  Specifically, the Commission may consider "any other issues" that it "considers relevant to the assessment of acquisition in relation to the public interest, convenience, and necessity."  *Id.* § 6-105(g)(2)(xii).

At the conclusion of the proceeding, the Commission is to issue a written decision that is based on the record and that states the grounds for its conclusions.  *Id.* § 3-113(a). If the Commission is satisfied that the applicant has borne its burden, it is required to issue an order granting the application.  *Id.* § 6-105(g)(3)(i).  The Commission, however, has the discretion to "condition an order authorizing the acquisition on the applicant's satisfactory performance or adherence to specific requirements."  *Id.* § 6-105(g)(3)(ii).  If the Commission concludes that the applicant has failed to meet its burden, it shall issue an order denying the application.  *Id.* § 6-105(g)(4).  An interested party that is dissatisfied with the Commission's final decision may file a petition for judicial review.  *Id.* § 3-202.

---

(v) the projected allocation of any savings that are expected to the public service company between stockholders and rate payers;
(vi) issues of reliability, quality of service, and quality of customer service;
(vii) the potential impact of the acquisition on community investment;
(viii) affiliate and cross-subsidization issues;
(ix) the use or pledge of utility assets for the benefit of an affiliate;
(x) jurisdictional and choice-of-law issues;
(xi) whether it is necessary to revise the Commission's ring fencing and code of conduct regulations in light of the acquisition; and
(xii) any other issues the Commission considers relevant to the assessment of acquisition in relation to the public interest, convenience, and necessity.

PU § 6-105(g)(2).

## B. The Commission's Rate-Making Authority

Under PU § 4-201, a public service company has a duty to "charge just and reasonable rates for the regulated services that it renders," and the Commission retains the power to set rates that comply with the statute. *Id.* § 4-102(b). A "just and reasonable rate" is a rate that, among other things, is "consistent with the public good" and "will result in an operating income to the public service company that yields, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return on the fair value of the public service company's property used and useful in providing service to the public." *Id.* § 4-101(2), (3).[6] In undertaking its statutory duties, the "Commission's role is to determine what rates the utility should be allowed to charge in future years to cover prudent expenses and earn a reasonable profit." *Office of People's Counsel v. Md. Public Service Comm'n*, 355 Md. 1, 8 (1999). The Commission is required

---

[6] In other cases involving this Court's review of the Commission's authority over public utility rate-making, this Court has cited to 1 A.J.G. Priest, Principles of Public Utility Regulation 45 (1969), which summarizes the factors that underlie the establishment of public utility rates as follows:

> The orthodox making of public utility rates requires four basic determinations: (1) what are the enterprise's gross utility revenues under the rate structure examined; (2) what are its operating expenses, including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues; (3) what utility property provides the service for which rates are charged and thus represents the base (rate base) on which a return should be earned and (4) what percentage figure (rate of return) should be applied to the rate base in order to establish the return to which investors in the utility enterprise are reasonably entitled.

*See Office of People's Counsel v. Md. Public Service Comm'n*, 355 Md. 1, 8 (1999); *Public Service Comm'n v. Baltimore Gas & Electric Co.*, 273 Md. 357, 360 n.2 (1974).

to enter an order when setting a "just and reasonable rate," PU § 4-102(c), which is subject to judicial review. PU § 3-202(a).

We turn to the Commission's merger administrative proceeding that resulted in its decision to approve AltaGas's acquisition of Washington Gas, as well as the Commission's subsequent rate case administrative proceeding that resulted in its approval of a rate increase—the latter proceeding being the subject of OPC's contentions in this matter.

## II

## Background and Procedural History

### A. *The Commission Proceedings Related to the Merger*

In 2017, AltaGas, Washington Gas, and WGL Holdings, Inc. ("WGL") (sometimes hereinafter collectively referred to as the "Applicants") filed an application seeking authorization from the Commission, as required by PU § 6-105, for AltaGas to acquire Washington Gas. Thereafter, the Commission initiated an administrative proceeding to evaluate whether the application was "consistent with the public interest, convenience, and necessity, including benefits and no harm to consumers[.]" PU § 6-105(g)(3). In addition to the entry of appearances for OPC and the Commission Staff, 11 parties filed petitions to intervene, which the Commission granted. The administrative proceeding included direct, rebuttal and rejoinder testimony, as well as extensive evidentiary hearings and briefing.

During the pendency of the proceeding, several of the intervenors entered into a settlement agreement with the Applicants that was filed with the Commission.[7]

In addition to the terms of the settlement agreement, the Applicants offered several commitments or conditions[8] for the Commission's consideration in connection with its approval of the merger. Two conditions proposed by the Applicants—Conditions 44 and 28[9]—are at the center of this matter. As will be discussed in more detail below: (1) Condition 44, among other things, required Washington Gas to provide at least $800,000 in annual "merger-related savings" to its Maryland customers (net of transition costs) for five years after the merger; and (2) Condition 28 required Washington Gas to issue post-merger reports providing a "side-by-side comparison by function" of its pre-merger and post-merger "corporate and shared-services costs." The parties in the instant case disagree on the manner in which "merger-related savings" required by Condition 44 would be

---

[7] The parties to the settlement agreement were the Applicants, and the intervenors: Maryland Energy Administration, Prince George's County, Montgomery County, and the Baltimore Washington Laborers and Public Employees District Council, an affiliate of the Laborers International Union of North America.

[8] The Commission's merger order and the parties use the terms "condition" and "commitment" interchangeably. We will use the term "condition"—which is the term used in PU § 6-105(g)(3)(ii).

[9] When the conditions were initially submitted by the Applicants, Condition 28 was numbered "Condition 26" and Condition 44 was numbered "Condition 41." Because the substance of the conditions did not change from the time that they were submitted until the Commission approved them (except for one sentence in what would ultimately become Condition 28), we refer to these conditions by the numbers as set forth in the final merger order.

calculated in future base rate increase cases. Specifically, the parties dispute whether the required savings were to be measured against what Washington Gas's costs would have been but for the merger, as the Commission and Washington Gas contend, or whether they were to be measured against Washington Gas's costs incurred in the year before the merger, as set forth in the comparison required by Condition 28, as OPC contends.

Washington Gas and Commission Staff presented different methodologies to the Commission for how "merger-related savings" should be computed in future rate cases. Because the testimony concerning these competing methodologies is pertinent to OPC's contentions here, we summarize some of the key testimony that was presented to the Commission, and the Commission's consideration of the same in the merger order that it ultimately entered.

### 1. Washington Gas's Methodology for Computation of "Merger-Related Savings"

Washington Gas presented a methodology for computing "merger-related savings" that centered around "synergy savings." Washington Gas submitted expert testimony by Todd J. Jirovec, a Principal in the power and utilities practice of a business named Strategy&. Mr. Jirovec testified that "synergy savings" or "synergies" are "tangible financial benefits" that arise when two companies merge and "represent a general reduction in costs or improvement to performance" that would not be realized in the absence of the merger. He explained that utility merger-related savings are typically achieved in three areas: (1) cost reduction, (2) cost avoidance, or (3) revenue enhancement. Mr. Jirovec described the types of synergies that are generally available through a utilities merger

10

transaction, and also explained that, in his experience, "no two transactions are necessarily the same in enabling the realization of synergies."

After providing an overview of synergy savings that are typically available in a utility merger and factors that may influence synergy levels generally, Mr. Jirovec testified concerning the specific synergy savings that he computed in connection with the proposed merger of AltaGas and Washington Gas. He explained how he developed his merger synergy computations, stating that "[w]e requested data from each company, interviewed AltaGas and Washington Gas staff, reviewed publicly available data and filings, and reviewed internal financial and other data. Based on these sources of input, we constructed baselines of comparable spending levels where merger savings are typically available."

Mr. Jirovec testified that the Applicants were expected to realize merger-related savings in the following corporate and administrative support functions: (1) corporate programs (by eliminating overlapping annual expenditures that both companies incur related to business and support activities); (2) supply chain (by reducing annual amounts that each company spends in the areas of materials and supplies and contract services); (3) functional alignment (by consolidating corporate and administrative support functions); and (4) portfolio shift (arising from economies of scale gained from the merger, which would enable Washington Gas to provide corporate and administrative services on a more efficient basis).

11

Mr. Jirovec produced a chart entitled "Net Annual Merger-Related Benefit Commitment to Maryland Customers[,]"[10] that reflected his prediction that the merger would provide Washington Gas's Maryland customers with a net benefit of $4.1 million over five years after subtracting amortized transition costs[11] associated with the merger. Notably, in arriving at his bottom-line prediction of the merger's net benefit to Washington Gas's customers, Mr. Jirovec's projections included a component of post-merger corporate costs that AltaGas would allocate to Washington Gas as part of its overall combined operations.

---

[10] Mr. Jirovec's chart computed the annualized net benefit that would be realized by Washington Gas's Maryland customers as follows (expressed in millions of dollars):

| | Maryland Allocable Share % | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|---|
| Corporate Allocations | 39.18% | $ 5.0 | $ 5.1 | $ 5.2 | $ 5.3 | $ 5.5 | $ 26.0 |
| Synergies | 39.18% | $ (2.8) | $ (6.1) | $ (7.3) | $ (7.7) | $ (8.3) | $ (32.2) |
| Amortized Transition Costs | 39.18% | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 2.1 |
| **Net (Benefit) Cost** | | **$ 2.7** | **$ (0.6)** | **$ (1.7)** | **$ (2.0)** | **$ (2.4)** | **$ (4.1)** |
| **Annualized Net (Benefit) Cost** | | **$ (0.8)** | **$ (0.8)** | **$ (0.8)** | **$ (0.8)** | **$ (0.8)** | **$ (4.1)** |

[11] "Transition costs" are non-recurring costs that are incurred to facilitate the integration of the merger. As we will discuss more fully herein, Washington Gas proposed, and the Commission agreed, that Washington Gas's transition costs could be amortized over five years.

12

### 2. Commission Staff's Methodology for Computing "Merger-Related Savings"

Commission Staff presented a different methodology for how "merger-related savings" should be computed in a post-merger rate increase case. Commission Staff presented expert testimony by Robert Welchlin, a Director of Overland Consulting, a firm that specializes in consulting in the electric, gas, water, and telecommunications industries. Mr. Welchlin expressed the opinion that there were few opportunities for Washington Gas to realize synergy savings from the merger.

In the event that the Commission approved the merger, Mr. Welchlin recommended that the Commission modify the Applicants' proposed Condition 44, which addressed how Washington Gas would compute "merger-related savings" in connection with any application for a rate increase. First, to prevent Washington Gas from "experiencing a potentially significant increase in corporate costs" following the merger, Mr. Welchlin recommended that the Commission prohibit the companies from allocating to Washington Gas *any portion* of AltaGas's existing corporate costs unless Washington Gas could demonstrate that the chargeable costs were no higher than the costs that Washington Gas recorded on its books in the last full year prior to the merger. To ensure compliance with this proposed condition, Mr. Welchlin recommended that the Commission require Washington Gas to track its pre- and post-merger costs, and certify that its comparison was "based solely on corporate-level expenses[.]" Mr. Welchlin suggested that the prohibition on any post-merger allocation of AltaGas's corporate costs to Washington Gas "should end as soon as Washington Gas demonstrates to the Commission that the merged company is

charging the utility no more, adjusted for inflation, than Washington Gas would have incurred had it not merged with AltaGas." In order to fairly compare pre- and post-merger corporate costs, Mr. Welchlin recognized that it would be "necessary to bring pre-merger dollar amounts to current price levels[,]" which he opined could "be done by applying an annual inflation factor, such as the consumer price index, to the annual pre-merger amount" or by using a 2.5% annual escalator.

To ensure that Washington Gas's computations followed the above framework, Mr. Welchlin recommended that the Commission revise Condition 44 to specifically define "merger-related savings" as the "reduction in pre-merger spending that occurred because of the merger that could not have been achieved but for the merger." He expressed his view that the condition should "explicitly adopt this definition, indicat[ing] that all pre[-] and post-merger costs identified for the purpose of calculating savings will be *actual* spending, and that each unique area of savings will be separately quantified and tracked by Washington Gas."

Mr. Welchlin opined that, without a specific definition of "merger-related savings" in the condition, "merger[-related] savings can be anything Washington Gas wants it to be." He reiterated that the "net merger benefit" should be the "net merger savings from synergies, after subtracting transition costs to achieve the merger and, in this case, after subtracting additional corporate costs that will be allocated to Washington Gas from AltaGas[.]"

**3. The Commission's Approval of the Merger and Pertinent Merger Conditions Included in Its Order**

After considering the oral and written testimony, along with other evidence, the Commission approved the application, subject to conditions. On April 4, 2018, the Commission issued a 64-page order explaining its decision, together with a 21-page appendix setting forth 52 conditions for approval of the transaction ("Merger Order"). *In the Matter of the Merger of AltaGas Ltd. & WGL Holdings, Inc.*, No. 9449, Order No. 88631, 2018 WL 1705968 (Md. Pub. Serv. Comm'n April 4, 2018).

The Merger Order included a description of the Applicants' proposal, the procedural history, the specific positions of the Commission Staff, OPC, the intervenors, and the Commission's analysis of the statutory factors enumerated in PU § 6-105(g)(2). After reviewing the evidence, and the various positions of the participants, the Commission determined that the merger "satisfied the three-part test" set forth in PU § 6-105(g)(3)(i). That is, subject to the imposed conditions, "the acquisition [was] consistent with the public interest, convenience, and necessity, including benefits and no harm to consumers."

In approving the merger, the Commission stated that it "carefully applied" its own precedent and the statutory standards enumerated in PU § 6-105 to the "facts of this case," pointing out that "every merger proposal is different." The Commission evaluated and imposed certain requirements on the Applicants, including (1) a one-time direct payment to customers, (2) conditions designed to ensure "synergy savings," (3) the establishment of a gas expansion fund, (4) safety programs, and (5) the payment of charitable contributions to provide benefits to Maryland consumers.

In connection with its approval, the Commission imposed 52 conditions, which covered a range of topics. We focus on two of them—Conditions 44 and 28. As the language and context of these conditions are pertinent to the present case, we discuss them in detail below.

*a. Condition 44*

Condition 44 addressed the manner in which Washington Gas would be required to demonstrate that it had achieved "merger-related savings" in post-merger base rate increase cases for a period after the merger closing. It appeared in a section entitled "Cost, Accounting, Tax, and Rate Neutrality," and required Washington Gas to "track and account for merger-related savings, and transition costs to enable those savings, in its next two base rate cases in which the test year in question includes transition costs."[12] "Merger-related

---

[12] In its entirety, Condition 44 stated:

Washington Gas will track and account for Merger-related savings, and transition costs to enable those savings, in its next two base rate cases in which the test year in question includes transition costs. Washington Gas will amortize the transition costs over five years, will not seek recovery in rate proceedings over those five years of any amortized transition costs or corporate costs allocated from AltaGas to Washington Gas in excess of Merger-related savings, and will ensure that customer rates reflect an annual net benefit to Washington Gas's Maryland customers of not less than $800,000 per year over the five years following Merger Close commencing with the first post-Merger base rate case (i.e., $4 million over five years). In the event that Washington Gas files a base rate case in Maryland in 2018, and the Merger Close occurs before or during the pendency of that rate case, then Washington Gas will consent to a ratemaking adjustment to reduce Washington Gas's revenue requirements by $800,000 as a known and measurable reduction in Washington Gas's cost of service during the new rate-effective period. 'Transition costs' as used in this [condition] are

16

savings" were defined as "the tangible financial benefits achieved as a result of the Merger for the five years after Merger Close that would not have been possible if the individual companies were to continue to operate separately." "Transition costs" were defined as "incremental non-recurring costs to facilitate the integration of the companies."

Condition 44 also required that Washington Gas (1) "amortize the transition costs over five years," (2) "not seek recovery in rate proceedings over those five years of any amortized transition costs or corporate costs allocated from AltaGas to Washington Gas in excess of merger-related savings," and (3) "ensure that customer rates reflected an annual net benefit to Washington Gas's customers of not less than $800,000 per year over the five years following Merger Close commencing with the first post-Merger base rate case." The phrases "corporate costs allocated from AltaGas" and "net benefit" were not defined.

Notably, although the Commission required that other proposed conditions be revised, the Commission did not make any changes to the language of Condition 44 as proposed by the Applicants. The Merger Order reflects that the Commission credited Mr. Jirovec's testimony and specifically referenced the Applicants' commitment in Condition 44 to ensure that "customer rates reflect an annual net benefit to Washington Gas's

---

incremental non-recurring costs to facilitate the integration of the companies. 'Merger-related savings' as used in this [condition] refers to the tangible financial benefits achieved as a result of the Merger for the five years after Merger Close that would not have been possible if the individual companies were to continue to operate separately.

17

Maryland customers of not less than $800,000 per year over five years following the Merger Close."

By contrast, the Commission did not adopt Mr. Welchlin's recommendation that Condition 44 be amended to define "merger-related savings" as "a reduction in [Washington Gas's] pre-merger spending" that "could not have been achieved but for the merger," to be determined by computing Washington Gas's *cost-savings* based on Washington Gas's actual spending. The Commission offered the following rationale:

> Although some parties have contended . . . that post-merger synergy savings are too vague to quantify, we conclude that [Condition 44] ensures that customer rates will decline or otherwise be lower than they would have been absent the merger and therefore complies with [the benefits] portion of our statute. Also, as Applicants observe, unlike in most merger situations which do not realize synergy savings for years after closing, the Applicants are applying these savings to ratepayers beginning in the first year. Therefore, we find that the synergy savings will result in direct ratepayer benefits.

The Commission commented on "the difficulty of quantifying" merger-related savings in previous cases, and specifically mentioned the "Exelon/Constellation" merger, a transaction it approved in 2012.[13] However, the Commission distinguished that merger from the Washington Gas merger, observing that Condition 44 would allow the Commission "to quantify these savings in the present case."

---

[13] *See In the Matter of the Merger of Exelon Corp. & Constellation Energy Group, Inc.*, No. 9271, Order No. 84698, 2012 WL 833884 (Md. Pub. Serv. Comm'n Feb. 17, 2012). In that proceeding, Exelon Corporation ("Exelon"), Constellation Energy Group ("CEG"), the Baltimore Gas and Electric Company ("BGE") and Exelon Energy Delivery Company sought the Commission's approval for a transaction in which Exelon would, by acquiring all of the stock of CEG, acquire the power to exercise substantial influence over the policies and actions of BGE.

### b. Condition 28

As we will discuss below, OPC contends that Condition 28 established the mechanism to measure the "merger-related savings" required by Condition 44. Condition 28 appeared in a section entitled "Affiliate Requirements" and required Washington Gas to provide the Commission with a "side-by-side comparison by function" of the pre-Merger and post-Merger "corporate and shared-services costs incurred by Washington Gas for the five years after Merger Close."[14] "For purposes of [Condition 28], pre-Merger mean[t] calendar year 2016." Additionally, "[i]n the event Washington Gas file[d] a base rate case prior to the receipt of the first year comparison," it was required to "include as part of its

---

[14] In its entirety, Condition 28 stated:

Washington Gas shall provide a side-by-side comparison by function of the pre-Merger corporate and shared-services costs incurred by Washington Gas as compared to the post-Merger corporate and shared-services costs incurred by Washington Gas for the five years after Merger Close[]. The comparisons shall be filed on an annual basis as a separate letter, and the first letter shall be filed no later than the end of the second quarter following the first full year after Merger Close. The comparisons shall include information by account under the Federal Energy Regulatory Commission ("FERC") Uniform System of Accounts. In the event that Washington Gas files a base rate case prior to the receipt of the first year comparison, Washington Gas will include as part of its base rate application a side-by-side comparison, by function, of pre- and post-Merger corporate and shared-services costs available through the test year, to the extent applicable. Additionally, in the second quarter after the first full calendar year following Merger Closing, and for every subsequent year for the next ten years, Washington Gas shall prepare and file with the Commission a report showing (i) AltaGas's annual charges to Washington Gas and (ii) Washington Gas's corporate and shared services costs. For purposes of this paragraph, pre-Merger means calendar year 2016.

19

base rate application a side-by-side comparison, by function, of pre- and post-Merger corporate and shared-services costs available through the test year, to the extent applicable."

Given that the Merger Order deviated from the terms of the settlement agreement on matters that are not related to the instant dispute (in which the Applicants had reserved the right to reject the merger rather than proceeding to closing), the Commission directed the Applicants to advise the Commission in writing of their intentions to close on the merger transaction no later than April 16, 2018.  The Applicants agreed to the revised conditions, and the merger transaction closed as contemplated.  No party filed a petition for judicial review of the Merger Order.

## B.    *The Rate Administrative Proceeding*

On August 28, 2020, Washington Gas applied to the Commission for authorization to increase its base rates.  The Commission delegated the matter to a public utility law judge ("PULJ") to conduct evidentiary proceedings.  *See* PU § 3-104(d)(1).

### 1.  Administrative Proceedings Before the PULJ

In support of its application, Washington Gas provided voluminous exhibits and written testimony from several witnesses.  Likewise, OPC introduced numerous exhibits and written testimony.  Although there were other disputed issues presented to the PULJ, we focus below on the competing testimony presented by Washington Gas's Chief Regulatory Accountant, Robert E. Tuoriniemi, and OPC's witness, Sebastian Coppola, on the specific issue of compliance with Condition 44.

*a. Mr. Tuoriniemi's Testimony and Evidence Concerning Washington Gas's Compliance with Condition 44*

Mr. Tuoriniemi explained that the purpose of his testimony was "to describe and support the test year amounts,[15] certain ratemaking and pro forma accounting adjustments, the ratemaking and pro forma amounts, and to show the calculation justifying the company's request for a base rate increase."

With respect to Condition 44 specifically, Mr. Tuoriniemi explained his understanding that the condition "require[d] Washington Gas to ensure that customer rates reflect an annual net benefit to Washington Gas's Maryland customers of not less than $800,000 per year over five years following [the merger close] commencing with the first post-Merger base rate case." Mr. Tuoriniemi described his methodology for computing "merger-related savings," "transition costs," "corporate costs allocated from AltaGas," and "net benefit"—the terms used in Condition 44—to ensure that the request for a rate increase complied with that condition in the Merger Order.

With respect to the "merger-related savings" arising from Washington Gas's merger with AltaGas, Mr. Tuoriniemi testified that during the test year, Washington Gas eliminated $21,703,998 of actual costs that it no longer incurred post-merger, and the portion attributed to its Maryland operations totaled $9,135,835. Mr. Tuoriniemi explained that the "primary savings identified" were labor-related expenses arising from positions

---

[15] As explained by Mr. Tuoriniemi, the "test year" represents the "actual amounts" of expenses and revenues Washington Gas accrued in the twelve months leading up to March 31, 2020.

that had been eliminated.[16]   Aside from labor, Mr. Tuoriniemi testified that the other savings that had been identified related to expenses associated with the board of directors, investor relations, external audits, director and officer insurance costs, as well as supply chain activities.

Next, Mr. Tuoriniemi explained his methodology for computing "transition costs" and assessing them in the test year.[17]   He testified that the test year included $609,188 of amortization expense related to the transition costs, and that Maryland's share of those costs totaled $255,439.

---

[16] Mr. Tuoriniemi provided the following explanation for the basis of his calculation of test year synergy savings:

[Washington Gas] compiled cost savings by department and those were aggregated in total synergy savings.  These represent the synergies identified to date . . . .  [O]nly test year amounts are included in the calculation of the adjustment . . . .  The amounts in the adjustment start at different dates in the test year.  Therefore, the adjustment calculates the pro-rated savings included in the test year for these costs.  For positions that were eliminated, the cost savings include the position's total compensation and an estimate of benefits.  The exception is for pension and post-retirement benefits where a specific calculation was only available for the Chief Executive Officer position as it is publicly disclosed in the Company's Form 10-K filings.

[17] Specifically, in assessing the impacts of merger-related costs on Washington Gas, Mr. Tuoriniemi explained that he categorized the costs into the following types: (1) costs incurred by Washington Gas to gain approval of the merger; (2) costs incurred by Washington Gas to close the merger; (3) costs incurred to integrate AltaGas, WGL Holdings, Inc., and Washington Gas, including any amortization thereof; (4) costs for services rendered to Washington Gas by AltaGas and its affiliates; and (5) costs incurred by Washington Gas that were eliminated by the merger.

With respect to "corporate costs allocated from AltaGas," Mr. Tuoriniemi described those as "[c]osts for services rendered to Washington Gas by [AltaGas] and its affiliates" and costs that were "charged for services." Mr. Tuoriniemi computed Maryland's share of these costs as $8,051,332.

Finally, with respect to the "net benefit" to Maryland customers, Mr. Tuoriniemi presented direct testimony describing the difference between the $9,135,835 in "merger-related savings," and $8,051,332 in "corporate costs allocated from AltaGas," which he computed to be $1,084,503. Mr. Tuoriniemi described this figure as the "net synergy savings," which, once reduced by the $255,439 in amortized transition costs, resulted in a "net benefit" to Maryland customers of $829,064, which he referred to as the "net change in costs post-merger."

In addition to his description of his methodology summarized above, Mr. Tuoriniemi presented the following chart demonstrating how he calculated the net benefit for the test year to be $829,064, thereby exceeding the $800,000 requirement set forth in Condition 44:

|  | Total Company[18] | Maryland |
|---|---|---|
| Test Year Charges from AltaGas | $ 18,774,305 | $ 8,051,332 |
| Adjusted Test Year Synergy Savings | (21,703,998) | (9,135,835) |
| Net Synergy Charge (Savings) | (2,929,693) | (1,084,503) |
| Test Year Transition Cost Amortization | 609,188 | 255,439 |
| Net Change in Costs Post Merger | $ (2,320,505) | (829,064) |

---

[18] Washington Gas's service area includes Maryland, Virginia, and the District of Columbia. Only Maryland's data are relevant to this matter.

Mr. Tuoriniemi testified that the amounts in the table were based upon entries in the company's books (with respect to costs) and an internal compilation of cost savings by department (with respect to synergy savings). In addition to Mr. Tuoriniemi's testimony, he presented documentary evidence consisting of 12 pages,[19] which included detailed calculations of synergy savings, including merger-related savings, such as salary and benefits information for positions that had been eliminated as a result of the merger and corporate cost savings related to board of director expenses, insurance, and supply chain operations.

Because Washington Gas had achieved the requisite net merger benefit for Maryland customers during the test year (i.e., the $800,000 required by Condition 44), Mr. Tuoriniemi did not make a ratemaking adjustment to the operating expense that Washington Gas sought to recover. Therefore, Mr. Tuoriniemi explained, the entire $829,064 of savings remained in the test year as a reduction in operating expenses.

> b. *Mr. Coppola's Testimony and Evidence Offering an Alternative Analysis of Washington Gas's Compliance with Condition 44*

In contrast to Washington Gas's analysis of its compliance with Condition 44, OPC took the position that Condition 44 and Condition 28 were "inextricably linked." Namely, OPC contended that one could not undertake an analysis of Condition 44 without considering the annual filing required by Condition 28, which required that for a period of

---

[19] Mr. Tuoriniemi's merger-related savings calculations were itemized in documentary evidence titled "Adjustment No. 20 – Merger Commitment-Synergy Savings" ("Adjustment 20").

five years after the merger close, Washington Gas would provide a side-by-side comparison of pre-merger and post-merger corporate costs and shared-services costs. In support of its position, OPC submitted direct testimony from its own expert witness, Sebastian Coppola, offering an alternative Condition 44 analysis.

Mr. Coppola agreed that Condition 44 sought to "ensure that post-merger costs billed from [AltaGas] and transition costs [did] not exceed the cost savings from the merger," and that it guaranteed that customers would realize "at least a net benefit of $4 million over five years from the combined operations of Washington Gas and [AltaGas.]" However, in his view, by requiring that Washington Gas file an annual report comparing pre- and post-merger corporate and shared services costs for a period of five years, Mr. Coppola opined that it was "clear that the Commission wanted to ensure that corporate and shared-services costs would not increase significantly post-merger from pre-merger levels in 2016."

Notably, Mr. Coppola undertook an analysis of "merger-related savings," utilizing the same methodology that Mr. Welchlin had recommended during his testimony before the Commission in the merger proceeding. Specifically, Mr. Coppola approached the analysis from a vantage point of ensuring that Washington Gas's corporate costs did not increase from the pre-merger 2016 baseline (aside from an adjustment for inflation). In undertaking his analysis, Mr. Coppola identified "those corporate and shared-services functions where there had been a significant increase in post-merger costs that are contrary to reasonable expectations of cost synergies that would be generated from the merger and

25

the combined corporate functions and activities." Mr. Coppola then disallowed the allocation to Washington Gas of any AltaGas corporate costs and shared service costs associated with corporate functions, including accounting, tax, finance, human resources, information technology, legal compliance, and supply chain. Mr. Coppola took Washington Gas's 2016 pre-merger costs and increased them by 2% from 2016 to 2019 to account for inflation. He then compared those inflation-adjusted pre-merger levels to the test year levels and calculated the difference. He then summed those function-specific cost increases and determined the percentage that would be allocated to Maryland customers. After subtracting the amount of amortized transition costs, Mr. Coppola calculated a total proposed disallowance of $4,259,730.

### c. The PULJ's Proposed Order

On February 12, 2021, the PULJ issued her proposed order approving the rate increase, but at a lower rate than Washington Gas requested.[20] On February 26, 2021, OPC appealed the PULJ's decision to the Commission on several grounds, one of which involved Condition 44.[21]

---

[20] The PULJ approved increasing Washington Gas's rates to generate an additional $11.9 million in revenue. Washington Gas had requested $28.4 million.

[21] A proposed order of a PULJ becomes final unless a party notes an appeal to the Commission within the time period for appeal designated in the proposed order. PU § 3-113(d)(2)(i).

## 2. Commission's Decision

On April 9, 2021, the Commission issued Order No. 89799 (the "Rate Order"), which resolved all the parties' contentions. The Commission rejected OPC's argument that Conditions 44 and 28 were "inextricably intertwined" and that Washington Gas was required to include a side-by-side comparison of pre- and post-merger corporate and shared costs to establish that the Company had experienced the annual $800,000 in synergy savings. The Commission noted that Conditions 28 and 44 were "separate [conditions]" that were "contained in two separate sections" of the appendix to the Merger Order, and that "neither condition refer[red] to the other." The Commission further observed that Condition 28 "explicitly require[d] Washington Gas to provide the Company's annual report in its next rate case if that case occurs before the first annual report is due." The Commission stated that "[t]his language strongly suggests that if Washington Gas does not file a base rate case before its first annual report is due, [Condition] 28's report is *not* required in Washington Gas's next rate case." The Commission observed that Washington Gas had complied with Condition 28 by filing the annual report in the second quarter of 2020.

The Commission agreed with Washington Gas that Condition 44 gave Washington Gas "more flexibility" in its computation of "merger-related savings" than the position advanced by OPC, so long as Washington Gas "established that Maryland ratepayers received over $800,000 in synergy-related savings during the test-year." The Commission credited Mr. Tuoriniemi's testimony that, as described by the Commission, Washington

27

Gas "achieved test-year synergy-related savings in Maryland of $829,603, slightly in excess of the annual savings required by" Condition 44. The Commission therefore concluded, "the PULJ had substantial evidence in the record upon which to conclude that no downward adjustment was necessary." The Commission found that Washington Gas satisfied Condition 44 and granted its request to recover amortized transition costs and corporate costs allocated from AltaGas during the test year.

Thereafter, OPC filed a petition for a rehearing, which the Commission denied by Order No. 89893. In rejecting OPC's argument that the Commission was required to read Conditions 28 and 44 together, the Commission stated that it previously explained "the basis for its decision," did not need to repeat it, and found "no reason to reconsider its conclusions." The Commission explained that "Mr. Tuoriniemi provided detailed testimony regarding the synergy savings required by [Condition] 44[,]" and that his "testimony was not contested in the record." The Commission stated that, although "OPC stated it found the supporting documentation confusing and noted that post-merger costs had increased[,]" "the PULJ and the Commission concluded that [Mr.] Tuoriniemi's testimony and exhibits sufficiently complied with the requirements of [Condition] 44." The Commission reiterated its prior determination that Condition 44 "*did not require costs to decrease so long as overall annual synergy savings exceeded $800,000.*" (Emphasis added). The Commission stated that "[t]he record supported that conclusion," and it therefore denied OPC's petition.

28

### 3. Judicial Review of the Commission's Decision

On August 30, 2021, OPC filed a petition for judicial review in the Circuit Court for Baltimore City. After the circuit court affirmed the Commission's decision, OPC appealed to the Appellate Court of Maryland, which affirmed the circuit court's judgment in an unreported opinion. *Matter of Maryland Office of People's Counsel*, No. 775, Sept. Term, 2022, 2023 WL 3316541 (App. Ct. Md. May 9, 2023).

The Appellate Court noted that the Public Utilities Article sets forth a "particularly discretionary standard of review" for Commission decisions. *Id.* at *3. In upholding the Commission's decision, the Appellate Court explained that the Commission was entitled to credit Mr. Tuoriniemi's testimony regarding synergy savings over Mr. Coppola's testimony and, based upon this testimony, conclude that Condition 44 was satisfied. *Id.* at *5. The court further noted that "[t]o overturn a Commission decision as arbitrary or capricious, a petitioner must overcome a very deferential standard to rebut the presumption that the Commission exercised its discretion properly." *Id.* (quoting *Office of People's Counsel*, 461 Md. at 400). The Appellate Court concluded that OPC failed to overcome that standard, that the Commission's decision was based upon expert testimony that the Commission chose to credit, and that it was not within the province of the court to substitute its judgment for that of the Commission. *Id.*

Lastly, the Appellate Court addressed OPC's contention that the parties to the merger had "promised the Commission" that the merger would result in "corporate cost savings for five years of at least $800,000 per year." *Id.* at *5. The Appellate Court stated

29

that "[t]he Commission expressly determined" "that the merger required no such thing." *Id.* The court pointed out that in its order denying OPC's petition for rehearing, the Commission stated that Condition 44 "did not require costs to decrease as long as overall annual synergy savings exceeded $800,000." *Id.* The court concluded that the record before the Commission provided sufficient support for its determination that Condition 44 was satisfied. *Id.*

Thereafter, OPC filed a petition for writ of *certiorari*, to consider the following questions, which we have rephrased for clarity:[22]

> 1. When undertaking judicial review of a Commission's decision approving a public service company's application for a rate increase, does a reviewing court apply an arbitrary or capricious standard of review to the Commission's interpretation of its own prior order approving the acquisition of the public service company?
>
> 2. In connection with its approval of a public service company's application for a rate increase, was the Commission's interpretation of its own prior order arbitrary or capricious?

---

[22] The questions presented in OPC's petition for writ of *certiorari* were:

1. Should the Commission's interpretation of the Merger Order be given the usual deference afforded Commission evidentiary findings, rather than reviewed in light of the parties' reasonable understanding of the Merger Order at the time it was issued?

2. Does an increase of $7.8 million in corporate costs post-merger comply with the Merger Order's plain language, intent, and purpose that the merger produce "tangible financial benefits" in the form of a "reduction in distribution rates" for customers?

For the reasons set forth more fully herein, we answer yes to the first question and no to the second question and, therefore, affirm the judgment of the Appellate Court.

## III

## Discussion

As noted above, the first issue we are asked to decide is what standard of review a court is to apply when a party seeks judicial review of the Commission's decision to approve a public service company's request for a rate increase and alleges that in connection therewith, the Commission erred in interpreting its own prior order. Before we address OPC's contentions, we describe the highly deferential standard that the General Assembly has enacted for judicial review of Commission decisions, and our case law discussing this standard.

### A. *Standard of Review*

In an appeal from judicial review of an agency decision, we review the agency's decision rather than the decision of the circuit court or the Appellate Court. *Office of People's Counsel*, 461 Md. at 391. In many contested case proceedings involving judicial review of a final decision of various state agencies, a court's standard of review is governed by the statutory standard in the Administrative Procedure Act ("APA").[23]

---

[23] Maryland's Administrative Procedure Act ("APA") is codified at Maryland Code Ann., State Government Article ("SG") § 10-201, et seq.

## 1. Review of a Commission Decision

For Commission decisions or orders, the General Assembly has set forth a separate

standard for judicial review in the Public Utilities Article, which states:

> Every decision, order, or regulation of the Commission is prima facie correct
> and shall be affirmed unless clearly shown to be:
>
> (1) unconstitutional;
>
> (2) outside the statutory authority or jurisdiction of the Commission;
>
> (3) made on unlawful procedure;
>
> (4) arbitrary or capricious;
>
> (5) affected by other error of law; or
>
> (6) if the subject of review is an order entered in a contested proceeding after
> a hearing, unsupported by substantial evidence on the record considered
> as a whole.

PU § 3-203. "Thus, the standard of review does not depend on whether we would reach

the same conclusions as the Commission, but on whether the Commission's decision or

process is infected by specific defects." *Office of People's Counsel*, 461 Md. at 391–92.

With respect to factual matters, "[b]ecause the Commission is well informed by its

own experience and specialized staff, a court reviewing a factual matter will not substitute

its judgment on review of a fairly debatable matter." *Communications Workers of Am. v.

Public Service Comm'n*, 424 Md. 418, 433 (2012) (citations omitted).

Concerning our standard of review applicable to matters committed to an agency's

discretion, we have explained:

32

When an agency acts in its discretionary capacity, it is taking actions that are specific to its mandate and expertise and, unlike conclusions of law or findings of fact, have a non-judicial nature. For this reason, we owe a higher level of deference to functions specifically committed to the agency's discretion. As long as an administrative agency's exercise of discretion does not violate regulations, statutes, common law principles, due process and other constitutional requirements, it is ordinarily unreviewable by the courts. Courts thus generally only intervene when an agency exercises its discretion arbitrarily or capriciously.

*Id.* at 434 (cleaned up).

Moreover, "to the extent that the agency is expected to apply its expertise to carry out its decision-making responsibility, courts will accord it greater leeway before labelling its exercise of that responsibility as arbitrary or capricious." *Office of People's Counsel*, 461 Md. at 400. "To overturn a Commission decision as arbitrary or capricious, a petitioner must overcome a very deferential standard to rebut the presumption that the Commission exercised its discretion properly." *Id.*

As we have said on more than one occasion, the standard of review of Commission decisions under PU § 3-203 is consistent with the standard of review applicable to all administrative agencies, including review under the APA. *Office of People's Counsel*, 461 Md. at 392; *see also Office of People's Counsel*, 355 Md. at 15; *Town of Easton v. Public Service Comm'n*, 379 Md. 21, 31 (2003). "In particular, the specific bases for reversing a Commission decision are the same as set forth for reversing an agency decision in the provision for judicial review in the APA." *Office of People's Counsel*, 461 Md. at 392.

However, although the statutory standards of review that govern Commission decisions and other types of administrative agencies are consistent, they are not identical.

33

In *Office of People's Counsel*, we noted that "PU § 3-203 also appears to be a more deferential standard in some respects compared to the standard of review under the APA." *Id.* We pointed out that "the General Assembly has directed that the Commission's decision is '*prima facie* correct' and is to be affirmed unless the listed defects are 'clearly shown.'" *Id.* Observing that this language is absent from the APA's provision governing judicial review, we stated that the "distinction [did] not appear to be unintended." *Id.* We pointed out that the "statute establishing the Commission preceded the APA" and that the "APA provision concerning judicial review was enacted just two years after the enactment of the . . . judicial review provision in the Commission's statute." *Id.* (footnote omitted). And as we previously expressed, had the Legislature intended that the standard for judicial review of Commission proceedings be the same as the standard for judicial review under the APA, "it is inconceivable that it would have excluded the . . . Commission from the APA." *Mid-Atlantic Power Supply Ass'n v. Public Service Comm'n*, 361 Md. 196, 214 (2000).

Recognizing the textual differences between the two statutes—and "[i]n giving meaning" to the "language in PU § 3-203 without rendering it surplusage"—we have explained that a court should "be particularly mindful of the deference owed to the Commission on those issues on which courts typically accord some degree of deference to administrative agencies—*i.e.*, findings of fact, mixed questions of law and fact, and the construction of particular statutes administered, and regulations adopted, by the agency." *Office of People's Counsel*, 461 Md. at 393–94 (footnotes omitted). By contrast, we

34

observed that, on questions in which a court would not typically apply agency deference—such as general questions of law, jurisdiction, or constitutional questions—"PU § 3-203 requires no greater deference to the Commission than any other agency." *Id.* at 394. These types of "legal questions are completely subject to review by courts." *Id.* (internal quotations omitted). "In sum, with respect to the Commission, this Court has tended to accord particular deference (though not total deference) to [its] decisions." *Id.* (cleaned up).

In this case, OPC alleges that because it is raising an "error of law"—namely, that the Commission erred in its interpretation of its Merger Order—we should consider the language of the Merger Order without deference to the Commission's interpretation. Because not all allegations involving "errors of law" involve a monolithic application of agency deference principles, it is useful to describe when we may apply agency deference, and if so, how much.

### 2. When, and to What Extent, We Apply Agency Deference to "Errors of Law"

We recently summarized the standards of review that we apply when a court is undertaking judicial review of an agency decision that is based on an alleged "error of law." *Comptroller v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 360 (2022). We explained that the phrase "'errors of law' encompasses a variety of legal challenges, including: (1) the constitutionality of an agency's decision; (2) whether the agency had jurisdiction to consider the matter; (3) whether the agency correctly interpreted and applied applicable case law; (4) and whether the agency correctly interpreted an applicable statute or regulation."

35

*Id.* Here, we add a fifth category to our list of "errors of law"—judicial review of an agency's interpretation of its own decision or order that it enters in connection with an administrative proceeding in which it is required to apply its technical expertise and discretion.

As noted in our discussion above, "[a]lthough we do not apply any agency deference when undertaking a review of the first three types of legal challenges, we occasionally apply agency deference when reviewing errors of law related to the fourth category." *Id.* In this case, we are asked to determine whether we apply agency deference to the fifth category. Before we turn to our discussion of what standard of review we apply to this newly identified category, it is useful to summarize our agency deference principles as they apply to the first four categories.

With respect to an agency's interpretation of a statute that it administers, this Court applies a "sliding-scale approach" in which the weight that we may give to an agency's interpretation depends on a number of factors. *Md. Dep't of the Environment v. Assateague Coastal Trust*, 484 Md. 399, 451 (2023). "We give more weight when the interpretation resulted from a process of reasoned elaboration by the agency, when the agency has applied that interpretation consistently over time, or when the interpretation is the product of contested adversarial proceedings or formal rule making." *Id.* at 451–52 (quoting *FC-GEN*, 482 Md. at 363); *see also Md. Dep't of the Env't v. County Comm'rs of Carroll County*, 465 Md. 169, 203–04 (2019); *Baltimore Gas & Electric Co. v. Public Service Comm'n*, 305 Md. 145, 161 (1986).

When the "error of law" involves an administrative agency's interpretation of its own rule or regulation, we have explained that even more deference is in order. *Assateague Coastal Trust*, 484 Md. at 452–53 (citing *Kor-Ko Ltd. v. Md. Dep't of the Env't*, 451 Md. 401, 424–25 (2017)). "Because an agency is best able to discern its intent in promulgating a regulation, the agency's expertise is more pertinent to the interpretation of an agency's rule than to the interpretation of its governing statute." *Kor-Ko Ltd.*, 451 Md. at 412–13 (citations omitted). "Put another way, the courts do not play the role of an über administrative agency in reviewing the actions of state or local administrative bodies, but, rather we exercise discipline in our review so as not to cross the separation of powers boundary." *Id.* at 413.

When applying an arbitrary or capricious standard of review, this Court has analogized it to the standard under federal administrative law,[24] in that one challenging the

---

[24] In *Office of People's Counsel*, we characterized Maryland's arbitrary or capricious standard as "similar to the standard under federal administrative law." 461 Md. at 399. We explained the federal standard as follows:

> The leading case defining the federal standard is *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). There, the [United States] Supreme Court identified several factors that could render an agency action arbitrary or capricious, including whether: (1) there is a rational connection between the facts found and the choice made; (2) the decision was based on a consideration of the relevant factors; (3) there has been a clear error of judgment; (4) the agency relied on factors which Congress has not intended it to consider; (5) the agency has entirely failed to consider an important aspect of the problem; (6) there is an explanation for a decision that runs counter to the evidence; and (7) the decision is so implausible that it could not be ascribed to a difference in view or the product

agency's decision "must show that the agency exercised its discretion unreasonably or without a rational basis." *Office of People's Counsel*, 461 Md. at 399 (citing *Harvey v. Marshall*, 389 Md. 243, 297–304 (2005)). "Whether an agency decision is arbitrary or capricious also depends, to some extent, on the degree of discretion that the Legislature has conferred on the particular agency with respect to the particular decision." *Id.* The standard is not easily defined and is highly contextual. *Id.* at 399–400. "However, to the extent that the agency is expected to apply expertise to carry out its decision-making responsibility, courts will accord it greater leeway before labelling its exercise of that responsibility as arbitrary or capricious." *Id.* at 400.

### 3. Application of the Above Standards to OPC's Allegation of "Error of Law" Here

Applying the above principles to OPC's contentions in this case, OPC is not contending that the Commission's decision was unconstitutional, outside of its statutory authority or jurisdiction, or was made as a result of an unlawful procedure—i.e., the types of legal questions in which the Court never applies deference. Rather, OPC ascribes an "error of law" to the Commission's interpretation of its own Merger Order—i.e., an "error of law" in which agency deference may be applied.

---

of agency expertise. This standard is not an invitation for a court to second-guess an agency's judgment: "a decision of less than ideal clarity" will be upheld "if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974).

*Id.* at 399 n.16 (cleaned up).

OPC contends that our review of the Commission's interpretation of its own Merger Order is analogous to the Commission's interpretation of a statute. From that premise, OPC points out that this Court does not always apply agency deference to an agency's interpretation of a statute that it is charged with administering, and by analogy, we should apply no deference here. For the following reasons, we determine that OPC's argument is inconsistent with the highly deferential standard of review required by PU § 2-203, our case law describing the deference principles required by this statute, and our jurisprudence applying agency deference in other administrative contexts.

First, in arguing that we should not apply agency deference with respect to this particular "error of law," OPC omits any discussion or analysis of the highly deferential language contained in PU § 3-203. Under the plain language of the statute, Commission decisions, orders, and regulations are "*prima facie* correct" and "*shall be affirmed unless clearly shown to be*" "affected by [an] error of law." PU § 3-203(5) (emphasis added). The standard of review advanced by OPC would be inconsistent with our prior interpretation of this language—namely that a reviewing court must be "*particularly mindful of the deference owed to the Commission on those issues on which courts typically accord some degree*" *of agency deference*, including "the construction of particular statutes" that the Commission administers, and the regulations adopted by the agency. *Office of People's Counsel*, 461 Md. at 393–94 (emphasis added).

Second, OPC's argument fails to recognize that our standards of judicial review do not treat all "errors of law" the same when considering whether to apply agency

39

deference.[25] As discussed above, there are types of "errors of law" for which we apply no deference, there are other types in which we may apply some degree of deference, and there are still other types in which we apply a higher degree of deference.

Third, OPC's analogy of the asserted "error of law" here to the Commission's interpretation of a statute is inapt. This case does not require that we consider the plain language of a statute or the Legislature's purpose and intent in enacting it. The "error of law" that we are being asked to consider here involves the *Commission's interpretation of its own decision or order* that it entered in connection with an administrative proceeding in which it is required to apply its technical expertise and discretion. As discussed above, in carrying out its statutory duties associated with the approval of an acquisition of a public service company, the Commission has broad discretion to consider "*any other issues*" that it "considers relevant to the assessment of acquisition in relation to the public interest, convenience, and necessity[,]" PU § 6-105(g)(2)(xii) (emphasis added), and to impose conditions as part of its order to ensure "the applicant's satisfactory performance or adherence to specific requirements." PU § 6-105(g)(3). As the Appellate Court has

---

[25] For example, to support its contention that this Court does not apply deference when an agency "has committed an error of law," OPC cites to a case in which the Court refused to apply deference to a county zoning board of appeals' application of this Court's zoning opinions in three "recent cases." *See Lewis v. Dep't of Natural Resources*, 377 Md. 382, 437 (2003), *superseded by statute on other grounds as recognized in Bereano v. State Ethics Comm'n*, 403 Md. 716, 756 (2008). This case does not lend support to OPC's position. It would be illogical for this Court to defer to a local zoning board's interpretation of this Court's case law. It would, however, be appropriate for this Court to apply deference to the Commission's interpretation of its own prior order involving the same public service company on matters within the Commission's area of technical expertise.

observed, "[a] great deal of discretion is necessarily vested in the Commission in order that it may properly discharge its important and complex duties." *Office of People's Counsel v. Public Service Comm'n*, 52 Md. App. 715, 722 (1982). The Merger Order, including its attendant conditions, was approved in connection with the Commission's exercise of its expertise and discretionary authority to impose conditions when approving an acquisition of a public service company. It was approved as part of a contested administrative proceeding in which any party had the right to seek judicial review. Thereafter, the Merger Order was interpreted and applied by the Commission in connection with an application for a utility rate increase—a subsequent administrative proceeding in which the Commission was also utilizing its technical expertise.

We determine that where the allegation of an "error of law" involves the interpretation of the Commission's own merger order under the circumstances presented here, it falls on the outermost deference spectrum, thereby commanding a more deferential review under the "arbitrary or capricious" standard. The Commission is best able to discern its intent behind the conditions that it imposed in the exercise of its discretionary authority to impose merger conditions, as well as when applying those conditions in a subsequent rate case involving the same public service company. Such a standard is consistent with the highly deferential standard required by PU § 2-203 and our case law applying agency deference principles involving an agency's interpretation of its own regulations. *See Kor-Ko Ltd.*, 451 Md. at 420–21 (deferring to the Maryland Department of the Environment's "interpretation of its own regulations" because the Court was "especially mindful of that

agency's expertise in its field[,]" and concluding that the interpretation was "permissible legally, and neither arbitrary nor capricious").

For these reasons, we hold that the "arbitrary or capricious" standard of review applies when a reviewing court is asked to consider an administrative agency's interpretation of its own prior decision or order that it entered in connection with an administrative proceeding in which it was required to apply its technical expertise and discretion. We shall apply this standard in assessing whether the Commission properly interpreted its own Merger Order in the subsequent rate administrative proceeding.

### B. The Parties' Competing Interpretations of Condition 44

OPC argues that under the language of the Merger Order, Condition 44 and Condition 28 are "inextricably intertwined." According to OPC, the text of Condition 44 addressed only the requirement that Washington Gas "track and account for merger-related savings and transition costs to enable those savings, in its next two base rate cases" but did not specify *how* those savings are to be measured. OPC points out that "merger-related savings" in Condition 44 is defined to include only "tangible financial benefits," which, according to OPC, foreclosed Washington Gas's ability to seek a rate increase based on "vague" and "inherently speculative" testimony about "hypothetical" costs that Washington Gas might have incurred absent the merger.

OPC asserts that Condition 28, by its "plain terms," was intended to serve a "ratemaking function" and to provide the mechanism by which Washington Gas was required to measure "merger-related savings" in post-merger rate cases by comparing its

42

post-merger corporate and shared-services costs to its pre-merger costs using 2016 as the baseline. OPC contends that Condition 28 is the only condition in the Merger Order that provided the actual comparative cost data needed to make a calculation of "tangible financial benefits." Furthermore, OPC asserts that if Condition 28 does not serve a "rate-making function," it is simply an annual report that has no purpose.

As explained by OPC's expert witness, Mr. Coppola, by requiring in Condition 28 that Washington Gas file an annual report comparing the pre- and post-merger corporate and shared services costs for a period of five years, it was "clear" that the Commission wanted to ensure that corporate and shared-services costs would not significantly increase from pre-merger costs. According to OPC's interpretation, reading Conditions 28 and 44 together, the Commission's Merger Order effectively prohibited Washington Gas from seeking any rate increase attributable to any post-merger increase in corporate costs for a period of five years. In other words, OPC contends that, when one reads Conditions 44 and 28 together, a five-year ceiling was established on Washington Gas's post-merger corporate and shared costs, whereby the merger synergy savings to Washington Gas's ratepayers would be determined by computing Washington Gas's pre-merger costs less $800,000. Under its reading, OPC contends that these conditions "guaranteed that the merger would reduce rates by at least $800,000 per year for five years after the merger."

OPC also contends that its interpretation of Condition 44 is consistent with Commission precedent involving other public service company mergers in which the Commission rejected public service companies' attempts to quantify merger savings by

43

comparing post-merger costs to "hypothetical projections of what might have occurred absent the merger." OPC asserts that in those decisions, the Commission found such hypothetical savings "too vague to quantify," "inherently speculative," and "too intangible to qualify as a benefit" under PU § 6-105.

OPC asserts that in approving the rate increase in the Rate Order, the Commission erred in accepting Washington Gas's "merger-savings" analysis under Condition 44 because Mr. Tuoriniemi's computation reflected an increase of $7.8 million in post-merger corporate costs, which it contends violates the conditions in the Merger Order that prohibited the allocation of any increased post-merger costs. Accordingly, OPC asserts that the Rate Order approving the rate increase that included the allocation of these corporate costs failed to produce "tangible financial benefits" to Maryland ratepayers in the form of a "reduction in distribution of rates."

Washington Gas and the Commission disagree with OPC's interpretation of Condition 44. They contend that Condition 44 was the mechanism that Washington Gas was required to follow to demonstrate "merger-related savings" in post-merger rate cases. They assert that the plain language of Condition 44 required that Washington Gas demonstrate that "merger-related savings" were at least $800,000 more than amortized merger transition costs plus corporate costs allocated from AltaGas to Washington Gas. The Commission and Washington Gas assert that nowhere—in either the Merger Order generally, or Condition 44 specifically—is there any blanket prohibition on increased

corporate costs (relative to 2016 or otherwise).[26]  Washington Gas and the Commission point out that Condition 44 makes no reference to Condition 28.  They contend that the "merger-related savings" provision in Condition 44 provided Washington Gas with greater flexibility to establish the net benefit to customers.

The Commission and Washington Gas assert that Condition 28 is an annual informational reporting requirement, and that the Commission routinely requires annual filings such as the filing required by this condition.

Finally, the Commission and Washington Gas argue that Mr. Tuoriniemi's testimony and exhibits substantiated the calculation that Washington Gas had generated merger-related benefits of $829,064 and that it was within the Commission's discretion to accept that testimony and evidence.  They contend that Mr. Tuoriniemi's testimony and evidence comport with the methodology outlined by the plain language of Condition 44, and that it was within the Commission's discretion to credit it.[27]

---

[26] Washington Gas points out that Conditions 23 and 24 expected increases in labor costs following the merger that would need to be recovered by a rate increase.

[27] Washington Gas also points out that OPC has not challenged the Commission's decision on the basis that it was unsupported by substantial evidence.  Based upon the questions presented in its petition for writ of *certiorari*, and OPC's arguments set forth in its briefs, we agree that OPC has not alleged that the Commission's decision is unsupported by substantial evidence.  Rather, OPC argues more generally that the Commission acted arbitrarily and capriciously because it misinterpreted its own order approving the merger and conditions therein and by permitting Mr. Tuoriniemi to utilize the methodology or framework that he used to show that Washington Gas had demonstrated the requisite "merger-related savings."

Concerning OPC's assertion that the Commission "deviated from precedent" by permitting Washington Gas to compute "merger-related savings" on prospective savings occasioned by synergies, Washington Gas points out that the Commission expressly considered that argument and rejected it in its analysis of that point in the Merger Order, by distinguishing the merger-related savings proposed by the Applicants in those cases and finding that the proposed synergy savings presented by Washington Gas in the merger proceeding would result in "direct ratepayer benefits."

### C. The Commission's Interpretation of Its Merger Order Was Not Arbitrary or Capricious

Based upon the record in this case, we determine that the Commission's interpretation of its Merger Order, including Condition 44, was not arbitrary or capricious.

In connection with the issuance of its Rate Order, the Commission considered and rejected OPC's argument that Conditions 44 and 28 were "inextricably intertwined" and that Washington Gas was required to include a side-by-side comparison of pre- and post-merger corporate and shared costs to establish that the Company experienced the annual $800,000 in synergy savings. The Commission reasoned:

> The [conditions] are contained in two separate sections of Appendix A to the [Merger Order], and neither [condition] refers to the other.
>
> Additionally, [Condition] 28 explicitly requires Washington Gas to provide the Company's annual report in its next rate case if that case occurs before the first annual report is due. This language strongly suggests that if Washington Gas does not file a base rate case before its first annual report is due, [Condition] 28's report is not required in Washington Gas's next rate case. Washington Gas did file the Company's [Condition 28] report in the second quarter of 2020. Therefore, the Commission agrees with Washington Gas that [Condition] 44 permits Washington Gas more flexibility than OPC

contends, so long as it establishes that Maryland ratepayers received over $800,000 in synergy-related savings during the test-year.

Thereafter, in denying OPC's motion for reconsideration, the Commission reiterated that Condition 44 "did not require costs to decrease so long as the overall annual synergy savings exceeded $800,000."

The Commission's explanation was reasonable. As the Commission correctly noted, neither condition refers to the other. Nor is there any language in Condition 44 to suggest that the Commission intended that the method for calculating synergy savings *must* be derived from the pre-merger corporate and shared-services costs data that is required to be included in the annual reports under Condition 28.

Under OPC's interpretation of Condition 44, the Merger Order not only prohibits rate increases attributable to corporate costs but also requires rate decreases. OPC asserts that when Conditions 44 and 28 are read together, Condition 44 "guaranteed that the merger would reduce rates by at least $800,000 per year for five years after the merger." The Commission's conclusion that Condition 44 provided Washington Gas with more flexibility is consistent with its explanation in the Merger Order in which it stated that "we conclude that this Condition ensures that customer rates will decline *or otherwise be lower than they would have been absent the merger* and therefore complies with [the benefits] portion of our statute." (Emphasis added). This language reflects that the Commission understood that the net benefit to Maryland customers could be achieved by synergy-related savings that were not directly tied to a reduction in actual spending based on

Washington Gas's pre-merger costs. In other words, the language in the Merger Order is consistent with the Commission's explanation in its Rate Order, which it reiterated in its order denying OPC's petition for rehearing, that Condition 44 "did not require costs to decrease so long as overall annual synergy savings exceeded $800,000."

Moreover, we also observe that the Commission's explanation of its interpretation of Condition 44 that it articulated in the rate administrative proceeding is also consistent with its analysis and consideration of that condition in the merger administrative proceeding. As discussed above, during the merger administrative proceeding, Robert Welchlin, an expert for the Commission Staff, recommended that the Commission require that "merger-related savings" be computed using the same methodology that Mr. Coppola employed in the rate-making case. That is, Mr. Welchlin suggested that the Commission should prohibit the companies from allocating to Washington Gas any portion of AltaGas's existing corporate costs unless Washington Gas could demonstrate that the chargeable costs were no higher than the costs Washington Gas recorded on its books in the last full year prior to the merger. Mr. Welchlin recommended that the Commission revise Condition 44 to specifically define "merger-related savings" as a "*reduction in pre-merger spending* that occurred because of the merger that could not have been achieved but for the merger." (Emphasis added). The Commission considered and rejected suggestions to modify Condition 44 to require Washington Gas to compute "merger-related savings" based upon actual cost savings using the 2016 pre-merger baseline. Based upon our review of the record of both proceedings, the Commission's interpretation of Condition 44 in the

48

ratemaking administrative proceeding is consistent with its discussion and analysis of that condition in the merger administrative proceeding—in which it considered and rejected entreaties to modify the definition of "merger-related savings" in Condition 44 to mean actual cost savings.

We turn next to OPC's argument that, if Condition 28 is not intended to serve a ratemaking function—and is instead simply an informational filing, as asserted by the Commission and Washington Gas—it is meaningless. The Commission and Washington Gas assert that the annual filings required by the Commission are not meaningless and serve important functions. During oral argument, counsel for the Commission explained that the Commission regularly imposes annual filing conditions on public service companies that are reviewed by Commission Staff in its accounting division.[28] We cannot determine, based upon this record, that the Commission's explanation that Condition 28 is an annual informational filing[29] and was not intended to ensure that Washington Gas's corporate costs would not increase from its pre-merger levels in 2016, is arbitrary or capricious. We observe that the General Assembly requires that public service companies

---

[28] In response to questions from the Court, counsel for the Commission explained the purpose of annual reports such as the report required by Condition 28. He explained that the reports are reviewed by the Commission Staff's accounting division, who have the authority to bring any concerns to the Commission's attention.

[29] The record of the merger administrative proceeding supports this explanation. For example, in its post-merger-hearing brief, Commission Staff stated that, through Condition 28, "Washington Gas has committed to make an annual informational filing[.]" Commission Staff also stated that "[t]he side-by-side comparison that would be filed annually [pursuant to Condition 28 is] intended to be informational only."

file with the Commission annual reports that must conform to any similar federal regulatory requirements, and those reports must contain detailed information covering a variety of financial, operational, and regulatory matters. *See* PU § 6-201, *et seq.* In this case, Washington Gas filed an annual report in accordance with Condition 28. Although the information in Condition 28 could have been used to compute "merger-related savings," nothing in Condition 44 indicated that it was required. As discussed in detail above, Commission decisions are *prima facie* correct and shall be affirmed unless *clearly shown* to be arbitrary or capricious. The Commission has provided a rational explanation for including Condition 28 in the Merger Order, and we determine that OPC has not satisfied its high statutory burden by clearly showing that the explanation is arbitrary or capricious.

Finally, we cannot say on this record that the Commission's interpretation of its Merger Order in this case is inconsistent with its prior merger cases. As discussed above, in the merger proceeding, the Commission specifically commented on the concerns expressed by some individuals that post-merger synergy savings would be "too vague to quantify" in future rate cases and rejected recommendations to add more restrictive language to the condition that would tie "merger-related savings" to an actual reduction in costs from the 2016 baseline. The Commission made a specific reference to the "Exelon/Constellation" merger, and distinguished this merger based upon the information that Washington Gas had provided to demonstrate synergy savings. The Commission explained that "unlike . . . most merger situations which do not realize synergy savings for years after closing, the Applicants are applying these savings to ratepayers beginning in

the first year." The Commission therefore found that "synergy savings will result in direct ratepayer benefits."

The record in the merger administrative proceeding reflects that the Commission considered arguments similar to those advanced by OPC here and rejected them. No petition for judicial review was filed in connection with the Commission's final decision in the merger administrative proceeding. In the context of the rate administrative proceeding, OPC has not overcome the *prima facie* correctness of the Commission's interpretation of its own Merger Order by clearly showing that the Commission interpreted Condition 44 in a manner that is arbitrary or capricious.

## IV

## Conclusion

For the reasons set forth herein, we hold as follows:

1.    When undertaking judicial review of a Commission's decision approving a public service company's application for a rate increase, a reviewing court is to apply an arbitrary or capricious standard of review to the Commission's interpretation of its own prior order approving the acquisition of the public service company.

2.    The Commission's interpretation of its own Merger Order in connection with Washington Gas's application for a rate increase was not arbitrary or capricious.

**JUDGMENT OF THE APPELLATE COURT AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**

51